**Affirmed and Majority, Concurring, and Dissenting Opinions filed October 29, 2015.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-13-00502-CV

---

### CHRISTINE E. REULE, Appellant

### V.

### M & T MORTGAGE, M & T BANK, BAYVIEW LOAN SERVICING, LLC, BAYVIEW FINANCIAL TRADING GROUP, LP, BAYVIEW FINANCIAL LP, HUGHS, WATTERS, ASKANASE, LLP, CAROLYN TAYLOR, AUDREY LEWIS, JEFF LEVA, SANDY DASIGENIS, AND RLZ INVESTMENTS, INC., Appellees

---

**On Appeal from the 234th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2008-75636**

---

## D I S S E N T I N G   O P I N I O N

How are courts to determine appropriate and just sanctions against a litigant who claims to be disabled and says the conduct being sanctioned is the product of a disability? This thorny issue is a question of first impression in Texas. The panel is divided. Though the majority argues the litigant's disabilities should play no

role in the sanctions determination, the court disposes of the issue by finding briefing waiver.[1] Under a merits analysis, even assuming the sanctioned conduct in this case was not disability-related, but willful and deliberate such that sanctions were warranted, the particular sanction imposed—writing rote sentences by hand—is demeaning and excessive, thus inappropriate for any litigant. For this reason, the trial court's sanction should not stand.[2]

Appellant Christine Reule asserts that the trial court abused its discretion in imposing sanctions against her for trial conduct. Her principal complaint is that the sanctions are inappropriate and unjust in light of her disabilities. Though Reule's appellate briefing on the point is imperfect, it is sufficient under a liberal construction for this court to reach the merits of the sanctions issue.[3] And, doing

---

[1] We must construe appellate briefs reasonably, yet liberally, so that the right to appellate review is not lost by waiver. *See* Tex. R. App. P. 38.1(f); *Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) (per curiam). Because finding briefing waiver is a discretionary call, when a point is not well-briefed, the deficiency might preclude appellate review and it might not. *See Statewide Hydraulics, Inc. v. EZ Mgmt. GP, LLC*, No. 14-13-01049, 2015 WL 167160, at *7 (Tex. App.—Houston [14th Dist.] Jan. 13, 2015, no pet.) (mem. op.) (presuming the brief challenged the critical findings when no findings specified in legal or factual sufficiency challenge because a point must be treated as covering every subsidiary question that is fairly included); *Elaazami v. Lawler Foods, Ltd.*, No. 14-11-00120-CV, 2012 WL 376687, at *6 (Tex. App.—Houston [14th Dist.] Feb. 7, 2012, no pet.). Depending on context and circumstances, the appellate court can choose to find a point waived or it can choose to find that the briefing, though flawed, is sufficient under a liberal construction to reach the merits. *See Statewide Hydraulics, Inc.*, 2015 WL 167160, at *7; *Elaazami*, 2012 WL 376687, at *6 (noting that appellate courts have discretion to determine whether a point of error is waived on appeal due to inadequate briefing). In this case, the court should choose a merits disposition.

[2] The majority misreads how the dissent would rule on the sanctions issue. *See ante* at p. 25. The disposition under this dissenting opinion is not to reverse and remand "because the trial judge might not have had the knowledge or expertise to determine whether Reule's sanctionable conduct was disability-related," as the majority asserts, *see ante* at p. 25, but rather because the handwriting sanction is an inappropriate punishment for any litigant, as other courts have held. *See Williams v. Tulane Univ. Med. Ctr.*, 588 So.2d 782, 783 (La. Ct. App. 1991); *see also Parker v. Progressive Ins. Co.*, 720 So.2d 408, 412 (La. Ct. App. 1998) (citing *Williams* for the proposition that sanctions may not be demeaning).

[3] Reule asserted in her brief that the trial court abused its discretion by sanctioning her

so would model the Supreme Court of Texas's practice of construing points liberally "to obtain a just, fair and equitable adjudication of the rights of the litigants."[4] Under a merits analysis, the court should reverse the trial court's sanctions order and remand the sanctions issue to the trial court for further consideration. Because the court instead affirms the sanctions, I respectfully dissent.

## FACTUAL BACKGROUND

Appellee/defendant Bayview Loan Servicing, LLC filed a motion for sanctions seeking to recover attorney's fees against Reule for litigation conduct that occurred during the parties' six-day trial. Following a hearing on Bayview's motion for sanctions, the trial court ordered Reule to pay monetary sanctions or submit to the trial court *a written statement in her own handwriting that states 100 times that, 'I will not waste the time of the Court, opposing counsel, jurors or court personnel.'*[5]

Bayview based its request for sanctions on Reule's "delays throughout the trial." Reule defended against the sanctions, stating, among other things, that she has a profound disability and identifying three distinct neurologically-based learning disabilities. Reule explained that she has dyslexia, Attention Deficit

---

because she was sick and disabled. One reason Reule was sanctioned was because she was disorganized and inefficient during trial. In her appellate brief, Reule explains that the cause was her disabilities. Reule relies on the appropriate legal standard—abuse-of-discretion—and argues that in this situation there was no good cause to impose sanctions against her. And, she asserts the sanctions are excessive. Given the context and circumstances, this court should opt to dispose of the sanctions issue on the merits. *See Statewide Hydraulics*, 2015 WL 167160, at *7; *Elaazami*, 2012 WL 376687, at *6.

[4] *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989) (noting "it is our practice to construe liberally points of error in order to obtain a just, fair and equitable adjudication of the rights of the litigants").

[5] Emphasis added.

3

Hyperactivity Disorder (ADHD), and a processing disability. Reule argued that the sanctions were not warranted because she "didn't do anything deliberately."

The hearing on the sanctions motion was brief. Reule, who had not before identified her dyslexia or ADHD, pointed to these and other disabilities as an explanation for the conduct. The trial judge did not respond to Reule's disabilities explanation other than to state the monetary sanction was a conservative amount. The trial court signed an order for Reule to pay $900 in monetary sanctions, later amending the order to include the handwriting option as a means to avoid payment of the monetary sanctions. No party or counsel requested the handwriting sanction. Reule objected to the sanctions order.

### SANCTIONS ANALYSIS

An appellate court reviews the imposition of sanctions for an abuse of discretion.[6] The test is whether the trial court acted without reference to guiding rules and principles because its ruling was arbitrary or unreasonable.[7]

Sanctions may be imposed for a variety of reasons—to enforce compliance with the relevant rules, to punish violators, to compensate the aggrieved party forced to incur costs to respond to baseless pleadings, or to deter other litigants from similar misconduct.[8] The Supreme Court of Texas has cited factors helpful in

---

[6] *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006); *Corea v. Bilek*, 362 S.W.3d 820, 824 (Tex. App.—Amarillo 2012, no pet.)(abuse-of-discretion standard of review applies to actions for sanctions under the trial court's inherent powers); *see In re S.M.V.*, 287 S.W.3d 435, 442 (Tex. App.—Dallas, no pet.).

[7] *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004) (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985)).

[8] *Mann v. Kendall Home Builders Constr. Partners I., Ltd.*, 464 S.W.3d 84, 91 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

4

guiding the process of determining a penalty for sanctionable behavior.[9] The factors include the offender's good or bad faith, the degree of willfulness or negligence involved in the offense, and the offender's knowledge or experience. In determining whether the trial court abused its discretion, a reviewing court is to conduct a two-part inquiry to ensure that the sanctions are appropriate and just.[10] First, there must be a direct relationship between the improper conduct and the sanction imposed.[11] Second, courts must ensure that less severe sanctions would not have been sufficient to promote compliance.[12] No Texas case addresses how these general principles apply in the context of a disabled litigant who claims the sanctioned conduct was not deliberate or willful but disability-related. The first step in the general analysis, though, focuses on the blameworthiness of the litigant, a consideration that goes to the core of the issue presented.

Bayview's counsel described the delays for which Reule was sanctioned as due in part to Reule's lack of organization and inefficiency in dealing with documents. He explained how counsel had to take breaks so that Reule could gather her exhibits, and he complained that she took too long with them, describing how she "sat there and went page by page." The case involved more than fifty exhibits, over 600 pages of documentary evidence. The print on many of the documents is in small font and single spaced, with dense paragraphs. The time Reule spent working with documents delayed the trial. Throughout the proceeding, the judge as well as defense counsel, endured tedious interruptions and down-time, at one point taking a nearly two-and-a-half hour break during direct

---

[9] *Low v. Henry*, 221 S.W.3d 609, 620 n. 5 (Tex. 2007).

[10] *See Am. Flood Research, Inc.*, 192 S.W.3d at 583.

[11] *Id.*

[12] *See id.*

5

examination so that Reule could compile needed exhibits.[13]   Defense counsel concluded that the trial judge "may have been fed up" and sent the jury home because Reule was "unable to proceed with her case even though it was in the middle of her examination."   In its sanctions motion, Bayview asserted that Reule wasted nine hours due to her lack of organization.   At the sanctions hearing, Bayview's counsel estimated that Reule probably made "a two to three day trial into a six day trial."

According to Reule, disorganization and inability to review documents efficiently are an inherent part of being dyslexic and having ADHD and processing problems. At the sanctions hearing, no one contested Reule's disabilities.[14]

The fact pattern in today's case is unusual in that the sanctioned litigant does not dispute the trial conduct for which she was sanctioned nor does she take the position that she did not understand what was expected of her at trial.   Her defense is rooted in a professed lack of capacity to do what was required.   The issue before the trial court and now before this court is whether the sanctioned trial conduct is the product of the litigant's disabilities rather than willful and deliberate behavior. The main point of departure between the majority and the dissent is how to make that determination.

### The Thorny Problem of Sanctioning Individuals with Disabilities

Is a litigant's disability a relevant consideration in a sanctions analysis?   If

---

[13] At times during the course of the litigation, Reule made remarks that showed a lack of respect for the trial court. But these remarks were neither the grounds for the sanctions motion nor the basis for the sanctions order.

[14] On appeal, the majority questions Reule's disabilities, but the movant for sanctions did not dispute them.   The record shows Reule receives social security disability benefits, though it is unclear whether these benefits are for the ADHD, dyslexia, learning disabilities, processing disabilities,  fibromyalgia, some combination of these disabilities, or for something else.

so, what is the test for determining if the sanctioned conduct is disability-related? What is the test for determining whether a litigant is truly disabled? How is the trial court to determine the effect of a disability on a litigant's conduct? If sanctions are warranted, what must the trial court do to ensure the sanction is appropriate and just in light of the litigant's disability? These and other issues surround the thorny problem of sanctioning individuals with disabilities.

The majority suggests that the trial judge could and did make the determination of whether the sanctioned conduct is disability-related based on Reule's litigation conduct as a whole.[15] This approach is problematic. *What if the trial judge does not have the knowledge or expertise to determine whether the sanctioned conduct is disability-related?*

The majority's approach might work in some cases, but not in all. As factfinder, the trial judge must discern between defiance and inability. Consider, for example, the litigant who fails to rise when the judge enters the courtroom. Is the litigant acting in defiance of proper courtroom demeanor? Or, is the litigant physically unable to perform the task? A judge must know the difference before imposing sanctions. Sometimes it is easy to tell. A wheelchair, for example, provides a visible and familiar sign of a litigant's physical disability. The wheelchair instantly alerts the judge that the litigant's failure to rise is not an act of defiance or disrespect, but an inability to do so due to a physical disability. Not all disabilities are so obvious.

When a litigant's disability is not apparent, discerning between oppositional behavior and inability is harder. A disability is sometimes masked by a seemingly normal exterior, and that sometimes causes observers to draw the wrong inferences

---

[15] *See ante* at p.26.

about a litigant's behavior. The challenge for the trial judge is to discern between oppositional behavior and disability. For instance, consider the inferences a court might draw if a litigant who suffered from Tourette's Syndrome punctuated his trial testimony with inappropriate outbursts that included vocal and vulgar slurs seemingly directed to the judge, opposing counsel, or jurors. On the surface, the behavior is outrageous, offensive, and utterly inappropriate. But, the analysis would surely change if the litigant disclosed that he suffered from a neurological disorder characterized by involuntary tics and vocalizations and often the compulsive utterance of obscenities.[16]

A trial judge ignorant of the disability and its unusual manifestations might hold such a disruptive litigant in contempt of court for foul language and unacceptable conduct. Yet, despite appearances, the litigant's inappropriate outbursts would be the product of a disability, not oppositional behavior, defiance, or disrespect. Sanctioning such a litigant for uncontrollable outbursts would be every bit as wrong as sanctioning a paraplegic litigant for failing to rise when the judge entered the courtroom. Disabilities are no less real because they are invisible.

### *General Sanctions Principles Applied to the Disabled Litigant*

General principles from sanctions jurisprudence suggest that if a court is considering imposing sanctions on a litigant alleging a disability, the court first must consider whether the litigant's behavior is the product of defiance, which is sanctionable, or the product of disability, which is not.[17] If the court determines

---

[16] NEW OXFORD AMERICAN DICTIONARY 1831 (3d ed. 2010). The above hypothetical illustration is not to be read substantively as support for the nature or properties of Tourette's Syndrome. The example is provided to illustrate the point, not for the technical accuracy of the description or application.

[17] *See generally Am. Flood Research Inc.*, 192 S.W.3d at 583 (holding that a trial court

that the litigant is acting willfully and deliberately, the court then must consider if the sanction contemplated is appropriate and just in light of the litigant's disability.[18] The legal standard recognizes the key difference between knowing what is expected and having the capacity to do it. Echoing this legal standard, Reule asserted that her actions were not deliberate. At the sanctions hearing, Reule defended against the sanctions motion by telling the trial court that she had "a profound disability that she was trying to deal with." She mentioned three learning disabilities at the hearing. Responding to the complaints about the additional time it took her to work with the exhibits, Reule stated, "I'm dyslexic and I have a processing disability." Reule was attempting to explain how she was overwhelmed with the stress from the trial when she stopped mid-sentence because she noticed the trial judge already was signing a sanctions order. She had not yet finished her explanation.

The record does not reflect how dyslexia, ADHD, or learning and processing disabilities impact an individual's ability to read and review documents efficiently or how these disabilities might have impacted Reule's organizational failures and inefficiencies at trial. Yet, not all of the sanctioned shortcomings raise the same level of concern. It is one thing to sanction a disabled litigant for chronic tardiness to court. (There is no problem with that; everyone needs to be on time.) But, it is quite another to sanction a dyslexic individual for not reading documents fast enough during trial.[19]

The sanctions motion and hearing dealt exclusively with Reule's behavior at

---

imposing sanctions is obligated to ensure that the sanctions are appropriate and just).

[18] *Id.*

[19] The trial court did not allocate the sanctions among Reule's various failures.

trial. The majority's litigation-conduct-as-a-whole approach to resolving the sanctions issue does not take into account the nature of the disabilities or the nexus, if any, between the disabilities and the sanctioned conduct, subjects that are typically beyond the knowledge of judges. Suppose in the Tourette's Syndrome hypothetical, the trial judge, knowing nothing about the disability, had followed the majority's litigation-as-a-whole model and concluded that the litigant had conducted himself properly for years without incident and so the obscenity-laced trial testimony must not have been disability-related. Or, suppose the record reflected that the litigant had testified in that offensive manner at every hearing in the case, spurring the judge to conclude the conduct was a matter of habit and not disability. Drawing inferences in this context can be unfair to individuals with disabilities, especially if they are pro se litigants who lack the financial means or legal know-how to make a showing that might persuade the court otherwise.

The majority's hostility to the notion that Reule's disabilities played any role in the sanctioned conduct exemplifies the problem inherent in judges, unaided by medical expertise, drawing inferences and making judgments about disabilities based only on observations. In this context, judges do not know what they do not know.

The majority makes observations about how Reule conducted herself over the course of the litigation and suggests that her pattern of conduct alone is enough to decide that sanctions are warranted, without regard to her disabilities. Given the technical subject matter (neurologically-based disabilities), more is needed to decide if there is a disability nexus. The undeniable reality is that judges typically will not know enough about a given disability or its manifestations to make a sound determination. This lack of knowledge also may prove problematic in deciding the appropriate sanction, should the court conclude that the litigant (or

10

lawyer) is disabled but the conduct is not the product of the disability.

A trial court imposing sanctions must ensure that the sanctions are appropriate and just.[20] A sanction that may be appropriate and just in one circumstance can be inappropriate and unjust in another. As part of the trial court's duty to impose only appropriate and just sanctions, the trial court has an affirmative obligation to see that the sanction it chooses is appropriate and just based on the circumstances presented to the court. No matter how bad the litigation misconduct might be, it would be wrong to sanction a disabled litigant by ordering the litigant to do an activity that strikes at the heart of the litigant's disability. Without a proper understanding of the disability, a judge might select a medically inappropriate sanction out of ignorance or oversight and unwittingly subject the disabled litigant to idiosyncratic difficulties (including physical pain) that would not be a problem for a litigant who did not have that disability. If a judge were to make such a selection, the sting of the disability-striking sanction would hardly be dulled because the judge did not intend the result.

The selection of unconventional sanctions for disabled litigants presents risks. The problem and potential abuse of discretion rests not in the judge's failure to know the particulars of the litigant's ailments and their manifestations, but in the judge's meting out the unconventional sanction without first finding out how it might affect the sanctioned individual given the disabilities disclosed.

When a judge imposes sanctions on a disabled litigant (or lawyer), what is required to determine the potential impact of the sanction on the disabled individual? Where do the burdens and presumptions fall? The disabled litigant is in the best position to know the likely impact of the sanction, but if the burden to

---

[20] *Am. Flood Research Inc.*, 192 S.W.3d at 583.

11

show why the sanction is inappropriate falls on the disabled litigant, the costs associated with making the showing would render the task impossible, or at least unfeasible, for many disabled litigants, especially the self-represented and indigent ones.

### *The Need for a More Tailored Legal Framework*

While the existing sanctions factors provide a broad framework for guiding courts in making sanctions determinations, our jurisprudence would benefit from a more tailored legal framework, and perhaps special rules and procedures, for navigating the difficult issues that arise in sanctioning litigants and lawyers who allege disabilities. Ideally, these would take into account the individual's particular disabilities, provide practical tools for all trial participants to better manage litigation expectations, and give the trial court a better framework to analyze the various issues before sanctioning disabled litigants or lawyers who increase system costs and burden system resources. Concerns about litigants like Reule taxing our legal system, championed in the concurring opinion, are important, yet there are also other, equally compelling considerations that impact large populations of disabled individuals.

Litigants (and lawyers) with disabilities must overcome challenges their courtroom counterparts might never experience. Sometimes it takes disabled individuals longer to complete litigation tasks. Punishing them for causing disability-related delays is not the answer. If an individual lacks the capacity to change the behavior because of a disability, sanctions will not deter the unwanted conduct. In addressing the problem, courts must strike a balance between the special requirements of the disabled individual, the needs of other litigants, and the everyday demands of busy court dockets. And, judges must do so in a way that is

compatible with the administration of justice.

Our legal system is best served when judges and lawyers make allowances for individuals with special needs. In today's case, both the trial court and opposing counsel granted Reule extensions on pretrial deadlines. When the exhibit-numbering requirements proved too challenging for Reule, the trial court modified them. When Reule was unable to locate exhibits during trial, the trial court and opposing counsel provided copies. When Reule needed to make changes to her exhibit list, they helped. Had Reule disclosed her dyslexia, ADHD, and other learning disabilities at some point before trial rather than waiting until the sanctions hearing, the trial court would have been better equipped to plan the proceeding and manage expectations. Reule could have made the trial court aware of how her disabilities were likely to affect her ability to perform at trial, giving the court an opportunity to address and perhaps minimize the difficulties before trial commenced. Still, under existing guidelines, Reule's failure to disclose her disabilities before trial, or to request accommodations, does not preclude her from raising them in defense of a sanctions motion.[21]

A pro se disabled litigant overwhelmed by the magnitude of trial preparation can make a legal proceeding especially vexing for skilled professionals whose experience and training, if matched on the other side, would bring things to a speedier conclusion. As this case illustrates, a single litigant's lack of organization, attention, and agility can make a trial an irksome experience for all other participants. There is no denying that people with disabilities can slow things down—some do not move as quickly, some do not see or hear as clearly, and some do not read as easily. Yet, how we treat disabled individuals who appear

---

[21] *See* Tex. R. App. P. 33.1 (stating that to preserve error for appeal, party must make timely and sufficiently specific objection in trial court). *See also TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917–18 (Tex. 1991).

in our courtrooms says much about what we value in our legal system.

There is no question that making allowances for individuals with special needs often produces inefficiencies and annoyances. But, at what point does our drive to get rid of these vexations yield to higher objectives? Though disability-related delays and inefficiencies sometimes mean increased attorney's fees for one side or the other, at what point do these costs become part of the inherent costs of a justice system that is open to all? The existing sanctions guidelines and factors are helpful in analyzing the issues, but they do not adequately address the thorny problem of sanctioning the disabled litigant.

We need a legal standard that both recognizes the special needs of individuals with disabilities and fosters litigation efficiency. The standard needs to be a workable one that will root out imposters and adequately protect the truly disabled, especially the indigent disabled. In a world where access to justice is becoming increasingly challenging for the poor, the numbers of indigent disabled in our courtrooms is sure to grow. There is a clear and compelling need for disabled litigants to be able to make disability showings in a reliable yet practical way. Resources are scarce. Proof is costly. And, fairness is paramount. Even though the outcome of this appeal does not turn on the thorny issue of sanctioning the disabled litigant,[22] it is important to raise these concerns and ask the hard questions so that we can address the challenges. The legal standard that ultimately

_____

[22] The majority's conclusion that this dissent turns on the disability issue is puzzling. *See ante* at p. 25. The outcome under this dissent rests solely on the impropriety of the handwriting sanction under existing law rather than on the disability issue or the application of any new rule or procedure to address it. Because the sanctions order can and should be reversed on the basis that the handwriting sanction is demeaning, excessive, and inappropriate, disposition of the issue does not require the fashioning *today* of a new legal framework that appropriately balances the needs of disabled litigants with the demands of the justice system. This part of the dissent functions much like a concurring opinion, the purpose of which is to raise awareness of an emerging issue and highlight the jurisprudential considerations that surround it.

14

develops will reach far beyond today's case.

On this record, we have nothing that tells us whether the sanctioned trial behavior is disability-related. Nor does the record reveal whether the trial court properly considered the possibility that Reule's disabilities contributed to the delays for which she was sanctioned. But, even assuming that the trial court rightly determined that the sanctioned conduct was willful and deliberate rather than disability-related, the trial court's imposition of sanctions still constitutes an abuse of discretion because the handwriting sanction was neither appropriate nor just.[23]

### *Handwriting Rote Sentences: A Foul Choice for Litigation Sanctions*

Reule argues the sanctions are excessive. To determine whether sanctions are excessive, a reviewing court necessarily must consider the particular sanction imposed.[24]

The aim of sanctions is to deter, punish, and compensate, not to shame or humiliate. It is wrong to order a litigant—*disabled or not*—to do a demeaning activity as a sanction for litigation misconduct.[25] As other courts have observed, handwriting sanctions are not only demeaning, but also pointless.[26] They serve no valid purpose.[27] Traditional sanctions, such as those provided in the Texas Rules

---

[23] *See Am. Flood Research, Inc.*, 192 S.W.3d at 583.

[24] *See Hamill v. Level*, 917 S.W.2d 15, 16 (Tex. 1996); *White v. Zhou Pei*, 452 S.W.3d 527, 545–46 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

[25] *Williams*, 588 So.2d at 783 (holding that sanctioning of the plaintiff's attorney to write 50 times legibly, in his own handwriting, provisions of Louisiana law, was not appropriate, setting aside sanction, and remanding for assessment of appropriate sanction); *see also Parker*, 720 So.2d at 412 (citing *Williams* for the proposition that sanctions may not be demeaning).

[26] *Williams*, 588 So.2d at 783 (noting that handwriting sanctions are demeaning and serve no utilitarian purpose).

[27] *Id*.

15

of Civil Procedure (or otherwise recognized by the Supreme Court of Texas) achieve deterrence, punishment, and compensation objectives while also preserving the dignity of the sanctioned individual and promoting public confidence in the fairness of our justice system.

Ordering a litigant to pay monetary sanctions or else perform a demeaning activity is not within a judge's discretion.[28] In exercising its power to sanction, a court should not make the sanctioned litigant choose between losing dollars and losing dignity. For some litigants, it is a false choice.

Reule is indigent.[29] When the sanctioned litigant has no money, the monetary alternative is meaningless. Thus, the trial court's order imposing sanctions on Reule is no less an abuse because the handwriting option is presented as an alternative to the monetary sanctions. If anything, heaping costs and attorney's fees on an indigent litigant while offering the demeaning chore as a coercive substitute for payment exacerbates rather than lessens the abuse of discretion. And, the sanction undermines equal application of the law. Non-monetary, non-demeaning alternatives are available. Sanctions that belittle and debase, whether ordered outright or as an alternative, are excessive, inappropriate,

---

[28] Reule complains in her appellate briefing that the sanctions are excessive and that the trial court abused its discretion in imposing them. The majority asserts that Reule did not argue the handwriting alternative was an abuse of discretion. But, appellate courts are to treat an issue or point as covering every subsidiary question that is fairly included in the issue or point. *Weingarten Realty Investors v. Harris Cnty. Appraisal Dist.*, 93 S.W.3d 280, 284 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Reule's issue requires this court to determine whether the trial court abused its discretion by issuing a sanction that included a handwriting alternative because that is covered within Reule's argument that the sanction is an abuse of discretion. *See id.* The appropriate-and-just determination is the heart of the inquiry. *See Am. Flood Research Inc.*, 192 S.W.3d at 583.

[29] Reule established her indigency in the trial court. The county did not dispute Reule's indigency status either in the trial court or on appeal. Though the trial court found Reule's indigency affidavit defective and ordered her to pay costs, Reule proved her indigency status and this court allowed her to proceed without paying costs. *See* Tex. R. App. P. 20.1(f).

and unjust. They have no place in Texas courts.

## CONCLUSION

When a trial judge deciding a sanctions motion stands at the intersection of litigant-caused inefficiencies and that litigant's disability, the judge ought not impose sanctions unless and until the judge has fair assurance that the conduct is not a product of the disability. A workable legal framework for making that determination has yet to be developed and, as demonstrated today, the challenge is to balance an assortment of considerations that may point in different directions in all but the simplest case. In this appeal, nothing in the record suggests the trial court considered the possibility that Reule's disabilities contributed to the trial behavior for which she was sanctioned. Only moments passed between Reule's identification of her disabilities and the trial court's swift imposition of sanctions. But, assuming that the trial court properly determined that the sanctioned conduct was not disability-related and that sanctions were warranted, there is still reason to reverse and remand the sanctions issue to the trial court: Texas law requires the sanction to be appropriate and just, and the handwriting sanction is neither.[30]


/s/    Kem Thompson Frost
Chief Justice


Panel consists of Chief Justice Frost and Justices Boyce and McCally (McCally, J., majority) (Boyce, J., concurring).

---

[30] *See Am. Flood Research, Inc.*, 192 S.W.3d at 583; *Williams*, 588 So.2d at 783.